We'll move to the third case of the day. Helen Overton v. Commissioner Saul, number 19-1873. Mr. Schultz. May it please the Court, Your Honors. Barry Schultz on behalf of the appellant, Helen Overton. In this case, the ALJ erred by failing to find Ms. Overton disabled during the two-and-a-half-year period when she was unable to obtain the Botox injections necessary to treat her migraine headaches. While the Commissioner suggests many reasons why the claimant was not disabled during this period, most of those reasons are not stated by the ALJ. The ALJ's primary analysis, and it's quite a detailed analysis of migraine headaches, is found at pages 1180 and 1181 of the administrative record. The ALJ starts the analysis on page 1180, the second full paragraph, stating that the claimant's migraines, quote, which I'll paraphrase, stating, And then the ALJ concludes that paragraph, stating, quote, The problem here, in a plaintiff's opinion, is that the ALJ found no limitations from migraine headaches when they were properly treated. He notes a period of several years, which we calculated as two-and-a-half years, when they were not properly treated, but yet he finds no limitations from the migraine headaches at all, even for the period of time when they were not properly treated. This Court has held generally that ALJs must build a logical bridge from the evidence to their conclusions, and here the ALJ did not do that by recognizing that Botox injections were the primary treatment that benefited Ms. Overton's migraine symptoms. Can I ask you a question, Mr. Schultz, about kind of the rhetoric of disability analysis here for both doctors and for the lawyers and judges and ALJs involved in these cases? When doctors were saying Botox controlled her migraines, does that mean she was not getting migraines at that point? No. No, it did not. And, in fact, the doctors— She was still having, what, two, three a month, right? Or am I misremembering? At times. The migraines varied when she was on Botox. At one point, I think the least frequency it showed was she had had four migraines in the previous three months, but there was a period in 2012 when she was getting the injections where she was having still, I believe, 12 migraines a month or more while she was getting the Botox. So it did vary. But the Botox was a huge improvement for her in terms of quality of life, which might lead a doctor to say she's improved, this is controlled or well controlled with Botox. In essence, Botox is making her life better, but it doesn't necessarily mean she was ready to work full time. Correct, Your Honor. I mean, we note in our reply brief that Botox is actually not even prescribed unless someone is having 15 migraine days a month or more. And so almost by definition, the claimant was experiencing severe impact from her migraines. But also, well, now we're talking about the period when she was getting Botox, but the numerous neurologists that Ms. Overton saw prescribed, in addition to the Botox, even when she was getting Botox, Imatrex injections or Vistaril injections and Phenagrin and Lamictal, Topamax, Reglan, many different medications to try to alleviate the symptoms once the migraine came on. And during this 30-month time frame, she still has been prescribed the Topamax, correct? Yes, that's correct. As far as we can conclude, she continues to take it, correct? As far as the record shows, yes, Your Honor. And during the time when she was not getting the Botox treatment, she told her psychiatrist in October of 2014 that her migraines were dominating her life. And then her physician's assistant, Mr. Johnson, was trying to find a referral for her for a neurologist because at that point she was only on Medicaid and she was having a very hard time finding a doctor who would administer the Botox treatments. Mr. Schultz, can I follow up on, I think, an aspect of Judge Hamilton's question? Just to try to be a little, ask you to be as specific as you can for what you recall from the record. So let's move outside the 30-month period, okay? Outside of that period, I have a note here. I don't know where I got it from, but I got it from somewhere in preparing for this that either she testified or the record shows that with the Botox, so once she was getting it, that she was experiencing one to two migraines per month. Okay, and I think this is where we get into this terminology of breakthrough migraines or that lingo or that description, breakthrough migraines, one to two per month. I don't recall. And so the only reason I'm asking you that is the frequency with which, what the record shows or doesn't show with respect to the frequency after she starts receiving the treatment seems important to me. Right, as opposed to arguing at a higher level of generality. Yep, still get some headaches from time to time. Well, what's the content of the from time to time? Right, and that's why I noted on page 1193 of the record, during a neurology visit in April of 2011, the claimant noted that the Botox injection had been very helpful and she had experienced only four migraines over the past three months. Right, so that's before the 30-month window, right? Correct, that's before the 30-month period. And given one to two days per episode of migraine that the claimant would be unable to function, even at four migraines in the three-month period, they would be incapacitating. Yeah, I mean one of the things that's in me, my question is, did the ALJ, I thought the ALJ observed, because there's a lot going on here, medically and, right, I mean migraines are just one drop in the bucket here. That's correct. Okay, but that she has suffered from migraines for a very long time. And during much of that time, pre-Botox, she was able to struggle through it and work. That's correct. So what I'm wondering about is with the Botox, which has been immensely helpful, it seems, does she have the capacity to function if she's experiencing, I say just, realizing how miserable they are, one to two migraines per month? Well, according to the vocational expert, she could not sustain competitive employment because she would be missing too much work. So the VE test, if you're off one or two days per month? Yes. I guess the premise of that, we'll see what the commissioner says, but the premise of that is that the headaches would take you out of work for the day. Yes, that's correct, Your Honor. The vocational expert testified at page 1270 that more than one absence per month would preclude competitive employment. And the claimant had told her doctors, and I think it's uncontradicted in the record, that when she got a migraine that they lasted at least one day, sometimes up to three days, and that there was throbbing pain on the right side of her face, and she experienced nausea, sometimes vomiting, extreme photophobia, phonophobia, had to lie down in a dark room. In fact, when she was self-injecting this Imitrax or the Vistaril, she was supposed to inject the medication, and then she was instructed to lie down once the migraine started in a dark room. Mr. Schultz, very briefly, one of the issues we may face here, if we agree with you that a remand is needed, would be the scope of that remand. This ALJ had gotten this case back before with instructions to hear from a vocational expert, and as I apparently asked that vocational expert, no questions? That's, I believe that's correct. The claimant's attorney asked the vocational expert about the absenteeism. Okay. Okay, thank you. Thank you, Your Honor. For the Commissioner, Mr. Chains. Thank you. May it please the Court. Good morning, Your Honors. Mr. Schultz, ladies and gentlemen. Daniel Robert Chains on behalf of the Commissioner. Your Honors, when an individual applies for disability, the agency begins by asking a simple, yet very important question. Why are you disabled? The answer drives many things, including the types of doctors and opinions needed, what limitations to include in the RFC, and what questions the ALJ should ask at the hearing. The sole issue before this Court today is Ms. Overton's migraines, which she claims to have as many as 25 per month, each lasting days at a time, leaving her unable to do anything during that time. In other words, migraines are not minor or forgettable, and they're not lost in the shuffle of other impairments. Overton alleges they're significant, so significant that she spends entire months trapped in an inescapable migraine. Yet when the agency asked Ms. Overton why she was disabled when she applied for benefits back in September of 2011, she did not list migraines as something that impacts her ability to work, nor did she in January 2012, nor again when the agency asked in May of 2012. In the December 2013 pre-hearing brief to the ALJ, mentions of migraines were passive and minimal. In an October 2014 brief to the Appeals Council, again, no mention of migraines. And perhaps most telling of all, in a March 2017 pre-hearing brief to the ALJ in this matter, counsel actually proposed a step two finding of what impairments defined as severe. It wasn't cursor, it was very thorough. He listed 25 impairments that he told the ALJ to find as severe, yet migraines still were not among those impairments. It's not until we reach the federal court level that Overton expresses the importance of migraines, calling it the sole issue and faulting the ALJ for relying on her own statements that migraines were not severe. It's a finding that should not have come to a surprise to Overton given her representations. On the other hand, the ALJ authored an extraordinarily thorough 60-page decision in this case that addressed migraines 60 times and considered Overton's other impairments and the arguments that Overton presented as the most prominent and important at that time. Now migraines, there's no diagnostic test that can detect migraines. There's no examination, and indeed no doctor in this case found migraine-related limitations. Thus the ALJ had to look to other evidence in determining the reliability of Overton's migraine complaints. The standard for that is patently wrong, which means this court will only reverse if the decision lacks any explanation or support. Now we've provided multiple reasons in our brief, but we'd like to bring your attention to five reasons today that show the ALJ's decision was not patently wrong. First, Overton's claim about the effectiveness of Botox. If you read Overton's testimony, she basically says Botox made very little difference, that even with Botox, she had migraines every five days lasting two to three days. Yet the evidence, as the ALJ discussed, was remarkably clear that Botox heavily mitigated or even stopped migraines. She had almost no treatment in calendar year 2013, and after she resumed Botox in 2016, she never reported another migraine. Second were that Overton made inconsistent claims about her migraines even without Botox. Now Overton specifies a period of January 2014 to June 2016. Yet in the first ten months of that period, Overton received treatment but never mentioned her migraines to her treating sources. In fact, in the first 14 months, that's relatively half the period, Overton only made two mentions of her migraines to her providers. And as the evidence went on, she called her migraines stable at times, improved, and she told her doctors that she walked three miles a day for exercise. Third, it's significant, and perhaps the most significant aspect of this case, is what happened when Overton did get Botox treatment again in 2016. Remember, this is a case where Overton alleges that Botox is the only cure, otherwise migraines are wholly incapacitating, taking her out for months at a time. Well, she missed her first follow-up appointment. Her neurologist warned her that she'd be dismissed from the practice if she didn't make it to her next appointment and didn't keep a headache log, but she did just that. She missed her appointment and was terminated. So the ALJ was right to question the casual manner in which Overton pursued treatment. Fourth were Overton's inconsistent statements about other impairments. Now, Overton tells the ALJ she needs a walker and that she's used this walker for eight years. She can't walk a single block without it. But Overton at the same time told her doctor that she walks three miles a day for exercise. The ALJ offered Ms. Overton the opportunity to explain this discrepancy, but Overton just simply said she could not remember. Finally, migraines are not a new impairment. Overton's been claiming migraines since 1993 with virtually the same symptoms. And Botox, Overton didn't receive Botox until 2009. But there's a key difference here. Overton worked at mostly substantial gainful levels from 1993 to 2010. That's almost two decades, while alleging virtually the same symptoms she alleges here. These five reasons show that the ALJ's decision was not lacking any explanation or support. And, Your Honors, represented claimants are presumed to have made their best case before the ALJ. What was their best case here? Well, in a 35-page brief to the ALJ, Overton's counsel said that migraines were not severe. And now she's trying to turn around and fault the ALJ for relying on counsel's representation, for relying on her counsel's representation. Counsel should not be able to do so and should be held to making their best case before the ALJ. This court judges the case under the patently wrong standard. It's a very deferential standard, and the court will reverse if and only if there is no explanation or support. We've presented five reasons today, and there are more in our brief. And for these reasons, we ask that the court find that the ALJ's decision was not patently wrong and affirm. Mr. Jaynes, there was stipulated remand earlier in this case, correct? That's correct, Your Honor. For purposes, at least in part, of getting testimony from a vocational expert? Yes, that was part of it. So it goes back to the same ALJ. Yes. What happened in that hearing with respect to the vocational expert? Well, they reached the vocational expert testimony, and the ALJ realized that the RFC was basically the same or very, very similar, the same as what it was before. So they could rely. They already had vocational expert testimony on that issue. They just relied on the prior vocational expert testimony. Okay. Not to be too sharp about this, but it sounds to me like the appeals counsel or a reviewing court might be skeptical about whether the ALJ, who got the case back on remand, was complying with the terms of the remand. Well, I understand, Your Honor, it might feel that way. The reason you enlist a vocational expert is because you provide the limitations that a claimant faces to the vocational expert, and then the vocational expert testifies about those limitations. Testimony would have been redundant because we already had a vocational expert who testified about that. Then what was the point of that part of the remand? The point was to look into who was weighing the opinions, with a shoulder and to basically an articulation error, as I read the remand, so that the ALJ could further explain some of the findings that they made that went unexplained. And I'll point out as well that that's not at issue before the court today. That was not brought, so our argument on that issue is waiver. Unless, Your Honors, you have any other questions, we'll rest on our brief. Thank you. Thank you, Mr. Jaynes. Mr. Schultz, rebuttal. The ALJ did not rely on the fact that the claimant didn't seek sufficient treatment during the period when she wasn't getting bow ties. That's not a finding that he made. And as Your Honor noted earlier, Ms. Overton suffered from so many impairments, having had a shoulder replaced and then have to have a revision of the shoulder replacement, a knee replaced and then a kneecap replaced after that, bone chips in the good knee, rotator cuff repair in the other shoulder, lumbar radiculopathy, and she was seeing a psychiatrist for depression and anxiety. She was on Medicaid, and she couldn't get the one treatment that really helped her, the Botox. So the fact that she didn't seek more treatment for the migraines wouldn't be a reasonable basis to reject the limitations during that time period. Okay. Thank you very much, Mr. Schultz. Thank you. Mr. Jaynes, the case is taken under advisement.